IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

MICHAEL WARD DAVIS                    )
                                      )
v.                                    )        No. 2:09-0116
                                      )        Judge Nixon/Bryant
SOCIAL SECURITY ADMINISTRATION        )


To:     The Honorable John T. Nixon, Senior Judge


## REPORT AND RECOMMENDATION

            This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c), to

obtain judicial review of the final decision of the Social Security Administration ("SSA" or

"the Administration"), through its Commissioner, denying plaintiff's application for

disability insurance benefits ("DIB") and supplemental security income ("SSI"), as provided

under the Social Security Act.  The case is currently pending on plaintiff's motion for

judgment on the administrative record (Docket Entry No. 17), to which defendant has

responded (Docket Entry No. 23).  Upon consideration of these papers and the transcript of

the administrative record (Docket Entry No. 13),[1] and for the reasons given below, the

undersigned recommends that plaintiff's motion for judgment be GRANTED, and that the

decision of the SSA be REVERSED and the cause REMANDED for further administrative

proceedings consistent with this report.

---

            [1]Referenced hereinafter by page number(s) following the abbreviation "Tr."

# I. Procedural History

Plaintiff filed his DIB and SSI applications on February 23, 2006, alleging the onset of disability as of January 1, 2001. After initial agency denials, plaintiff requested de novo review of his claim by an Administrative Law Judge ("ALJ"). On March 11, 2009, the ALJ held a hearing on plaintiff's claim, and testimony was received from plaintiff and from an impartial vocational expert. (Tr. 30-51) Plaintiff was represented by counsel at the hearing, and at that time formally amended his alleged onset date to February 6, 2006. (Tr. 33-34) After hearing the testimony, the ALJ took the matter under advisement until April 15, 2009, when he issued a written decision denying plaintiff's claim to benefits. (Tr. 19-29) That decision contains the following enumerated findings:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2011.

2. The claimant has not engaged in substantial gainful activity since February 6, 2006, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: history of right hip gunshot wound, with retained bullet fragment in the right hip; history of right hand fracture; history of bilateral carpal tunnel release surgeries; cervical spine and lumbar spine degenerative disc disease; panic disorder with agoraphobia; major depressive disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except the claimant can understand and remember for simple and detailed tasks. His ability to perform concentration, persistence and pace is adequate for the same tasks, despite some difficulty at times due to anxiety in working around others. He should

2

avoid working with the general public; however, he can interact appropriately with supervisors and co-workers over the course of a normal work week, despite some difficulty. He can avoid workplace hazards, respond appropriately to changes in the workplace, travel to unfamiliar places, and set realistic goals.

6. The claimant is capable of performing past relevant work as an assembly line worker, machine operator, axle rebuilder, forklift operator, and packer. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined in the Social Security Act, from February 6, 2006 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 21-23, 28)

On October 29, 2009, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 1-4), thereby rendering that decision the final decision of the Administration. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. §§ 405(g), 1383(c)(3). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. Id

## II. Review of the Record

The following record review is taken from plaintiff's brief, Docket Entry No. 18 at 2-16. Defendant does not offer a competing version of the facts, nor does it otherwise oppose plaintiff's rendition.

### Medical evidence

Mr. Davis has a long-standing history of depression. In 2001, he was admitted to Moccasin Bend Mental Health Center after a transfer from Cookeville Regional Medical Center due to a suicide attempt. (Tr. 878-880). Physical examination by Dr. Bush revealed a self-inflicted left wrist laceration. He was

Case 2:09-cv-00116   Document 24   Filed 10/24/11   Page 3 of 26 PageID #: 78

diagnosed with adjustment disorder with depressed mood and assigned a CGAF of 14 and HGAF of 65. (Tr. 199-200). On May 14, 2001, he went for follow up at Plateau Mental Health Center and was assessed to have moderate to severe problems. He was assigned a GAF of 55 at Plateau Mental Health Center. (Tr. 207-208).

Mr. Davis injured his lower back at work on April 8, 2003. He was treated at Middle Tennessee Occupational and Environmental Medicine, Inc. starting on April 9, 2003 when he was diagnosed with back strain. He was started on therapy and given Naprosyn on a subsequent visit. On April 17, 2003, an x-ray of the lumbar spine revealed mild rotoscoliosis and degenerative disc disease. (Tr. 429). By April 23, 2003, he was not improved so he was referred to Dr. Roy Terry. (Tr. 475).

On May 6, 2003, an MRI revealed mild degenerative disc disease at L3-4 and L4-5 with some mild facet degeneration. (Tr. 476).

On June 10, 2003, Dr. Daniel Donovan performed an evaluation and EMG. There was a chronic reinnervational change in the peroneus longus on the left. Sensory evaluation revealed diminished peroneal amplitude bilaterally most prominent in the right peroneal nerve. (Tr. 473-474).

On June 25, 2003, Mr. Davis saw Dr. Terry for anxiety, depression and low back pain. (Tr. 475).

In June 2003, Mr. Davis saw C. Todd Lewis for anxiety, depression and pain in his lower back and hips and numbness in his feet due to an injury on April 8, 2003. He was diagnosed with chronic depression and chronic anxiety with a fracture of the right hand, back pain with radiculopathy, occasional palpitations and essential hypertension. (Tr. 214-219).

On July 1, 2003, an MRI of the lumbar spine was performed at Smith County Memorial Hospital. The MRI showed mild degenerative disc disease and facet disease with annular disc bulging at L4-L5 resulting in some inferior encroachment of the neural foramen. (Tr. 466).

Mr. Davis was seen for a neurology consult with Dr. Maria Salibay in August 2003. He was diagnosed with lumbosacral radiculopathies. He was placed on a trial of Neurontin at that time. (Tr. 287-288).

4

In September 2003, Mr. Davis returned to C. Todd Lewis and reported having to take a break between shaving and showering due to pain. (Tr. 238). He was becoming progressively worse on each visit. He was injected with Nubain, Phenergan and Vistaril, given a Duragesic patch and a refill of Percocet. (Tr. 243). The Duragesic patches made him physically ill and broke out his skin. (Tr. 245). He was switched to Bupap for pain. (Tr. 249).

Mr. Davis visited Dr. Scott Baker on October 24, 2003. Dr. Baker performed a caudal epidurogram and epidural steroid injection and prescribed Percocet 10 and Ambien. He felt that there was mild degenerative disc disease, facet disease, and some neural foraminal stenosis. (567-568).

On December 3, 2003, his low back pain and bilateral leg pain continued at a level ten (10) of ten (10). (Tr. 563).

By January 2004, he returned to Todd Lewis stating that his back pain was intolerable and that he had lost his will to live. He was overwhelmed after losing his job, facing the loss of his home, and having issues with his ex-wife about his child. (Tr. 270). At that time, he was given prescriptions for Paxil and Xanax and received injections of Depo-Medrol and Toradol. (Tr. 274-275).

He returned to Dr. Terry on January 15, 2004 after having a series of three steroid injections from which he received no relief. He had not been on pain medication for a period of time and was placed on Lortab 5mg. Dr. Terry recommended further evaluation. (Tr. 618).

On February 23, 2004, he returned to Dr. Baker. He described his pain as a nine (9) of ten (10) in the lower back with sharp pain in both thighs. He additionally had groin pain with numbness in his feet bilaterally. Dr. Baker diagnosed him with chronic mechanical lumbar pain with bilateral leg pain and gave him a prescription for Percocet. (Tr. 558). Nerve conduction studies performed by Dr. Baker revealed right peroneal mononeuropathy. (Tr. 560-561).

In March 2004, Mr. Davis went to C. Todd Lewis for follow up on hypertension. He was diagnosed with back pain, anxiety syndrome and hypertension. (Tr. 811-812). He returned for follow up in April 2004. Added to his diagnosis were depression, hypogonadism, otitis media and wrist pain.

5

(Tr. 807-808).

Dr. Robert Landsberg evaluated Mr. Davis on May 26, 2004. Dr. Landsberg reviewed medical evidence of record including MRI reports dated May 6, 2003 and July 1, 2003 as well as records from Smith County Memorial Hospital, Dr. Daniel Donovan, Dr. Roy Terry, Premier Diagnostic Imaging, Dr. Scott Baker, University Medical Center, Physician's Urgent Care, Dr. Joseph Jestus, Physiotherapy Associates in Lebanon, Middle Tennessee Occupational and Environmental Medicine Inc., Smith County Medical Group, Dr. Maria Salibay and Todd Lewis. Dr. Landsberg performed range of motion and straight leg raise tests. Dr. Landsberg concluded that Mr. Davis was left with a 7% whole person impairment rating and that he was restricted to lifting fifteen pounds with proper techniques, no standing in one position more than thirty (30) minutes, no sitting in one position more than thirty (30) minutes, and walking limited to a maximum of thirty (30) minutes at a time. He opined that Mr. Davis would require a job that would alternate sitting, standing and walking. (Tr. 718-723).

Mr. Davis returned to C. Todd Lewis for follow up in June 2004 and again in July 2004. He complained of back pain, wrist pain, hypertension, hypogonadism, and having a lot of anxiety attacks. (Tr. 802). He was additionally diagnosed with palpitations, carpal tunnel disease, allergic rhinitis, depression and otitis media. (Tr. 803-807).

On September 21, 2004, Dr. Terry recommended a repeat MRI due to continued complaints of back and leg pain. (Tr. 748). An MRI report dated October 11, 2004 showed minimal desiccation and drying out of the lumbar disc at L4-5 and L5-S1 with mild degenerative disc disease at L5-S1, and a small amount of fluid within the facet joint on the right at that level and some degenerative facet disease at L4-5. (Tr. 700, 749).

On October 25, 2004, C. Todd Lewis referred Mr. Davis to a counselor for anxiety and depression. (Tr. 795). He diagnosed Mr. Davis with anxiety syndrome. (Tr. 798).

On July 10, 2005, Mr. Davis went to Smith County Memorial Hospital following a motor vehicle accident. He received Stadol and Phenergan intramuscularly for pain. He was diagnosed with back pain, neck strain, and a clavicle contusion. (Tr. 816). Two views of the clavicle revealed mild

6

degenerative change with spurring of the distal clavicle. (Tr. 819). Cervical spine views revealed degenerative changes with no fractures. (Tr. 819). He was taken off work for two days. (Tr. 816).

On August 16, 2005, Mr. Davis went to Smith County Memorial Hospital following another motor vehicle accident. A cranial CT revealed ethmoid sinuses. A CT of the cervical spine and CT reconstruction revealed cervical spondylosis. (Tr. 828-833).

On November 1, 2005, an MRI of the cervical spine revealed minimal central disc protrusion present C3-C4, C5-C6, and C6-C7. An MRI of the lumbar spine revealed degenerative disc changes present at L3-L4 and L4-L5. (Tr. 838).

Mr. Davis was treated for a gunshot wound to the abdomen with a bullet lodged in the femoral neck at Vanderbilt University Medical Center (VUMC) on April 5, 2006. (Tr. 863).

On July 11, 2006, Mr. Davis saw Bowdoin G. Smith, D. O., P. C. Dr. Smith noted that Mr. Davis had a long history of bipolar disorder, severe depression, social anxiety and back pain. He had been out of medications for a week or so and was not doing well. Dr. Smith found Mr. Davis suffered from chronic back pain, degenerative joint disease of the cervical spine, bipolar affective disorder, right hip pain, panic attacks, anxiety, depression post suicide attempt, allergic rhinitis, carpal tunnel syndrome, mitral regurgitation, and mitral valve prolapse. Dr. Smith prescribed Symbyax, Flexeril, Lyrica, Lotensin, Xanax and Percocet. Dr. Smith continued to see Mr. Davis in follow up and refilled his medications through November 2006. (Tr. 934-960).

Dr. Roy Johnson performed a consultative examination of Mr. Davis on July 21, 2006. Dr. Johnson concluded that Mr. Davis may be able to stand three and one half (3½) to four (4) hours per shift and occasionally lift up to fifteen (15) pounds with no sitting restrictions. (Tr. 882-885).

Mr. Davis was evaluated by Mark Loftis in August 2006. Mr. Loftis found Mr. Davis to have symptoms of depression including crying spells, loss of interest in pleasurable activities, chronic sleep problems, and suicidal thoughts. Mr. Loftis opined that Mr. Davis was able to understand simple instructions and that he had moderate limitations in his ability to deal with co-workers and deal with work-related stress. He opined that under stress, Mr. Davis was

7

likely to decompensate. (Tr. 886-892).

On September 26, 2006, Andrew J. Phay, Ph. D. completed a Psychiatric Review Technique. He found Mr. Davis had the following restrictions: a mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence and pace. (Tr. 903-916).

Dr. Phay also completed a mental residual functional capacity assessment. He found Mr. Davis to have the following moderate limitations: the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; and the ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. Dr. Phay found that Mr. Davis had the following functional capacity: Mr. Davis appeared able to remember locations and work-like procedures and understand and remember simple and detailed tasks; he was able to perform simple and detailed tasks; he was able to maintain concentration, perform routine daily activities and complete a normal work week with acceptable performance/productivity; he was able to sustain an ordinary work routine around others and make acceptable simple work-related decisions; he appeared likely to have some, but not substantial difficulty appropriately interacting with the general public, supervisors and peers in the workplace without significantly disruptive distractions or confrontations; he appeared able to maintain basic standards of neatness and cleanliness; he appeared to be aware of and appropriately respond to changes and hazards in the workplace, he appeared able to travel to unfamiliar places; and he appeared able to set and pursue realistic work goals in the work setting. (Tr. 917-920).

On October 30, 2006, state examiner Christopher W. Fletcher, M. D. found Mr. Davis had the following residual functional capacity: He could frequently lift and/or carry: fifty (50) pounds; occasionally lift and/or carry: twenty-five (25) pounds; stand or walk: about six (6) hours in an 8-hour workday; and sit: about six (6) hours in an 8-hour workday. He was given frequent postural limitations by Dr. Fletcher. (Tr. 921-928).

On October 30, 2006, state examiner Frank R. Pennington, M. D. found Mr. Davis had the following residual functional capacity: He could frequently lift and/or carry: fifty (50) pounds; occasionally lift and/or carry: twenty-five (25)

pounds; stand or walk: about six (6) hours in an 8-hour workday; and sit: about six (6) hours in an 8-hour workday. He was given frequent postural limitations with the exception of occasionally climbing ladders, ropes or scaffolds. (Tr. 1006-1013).

Treatment records from Dale Hollow Mental Health Center dated March 13, 2007 showed Mr. Davis to have panic disorder with agoraphobia. His depression was rated an eight (8) on a ten (10) point scale. He noted crying spells three (3) out of seven (7) days. He reported anxiety and panic symptoms. He was unable to shop as a result of difficulty being around people. He reported lying down and not doing anything three (3) out of seven (7) days and self-harm behaviors including self-mutilation (cutting) two (2) to four (4) times per month. He reported that his ex-wife was keeping his son from him and not allowing him to talk on the phone. He was assessed with a GAF of 50. On April 26, 2007, Dr. Chip Fountain noted that Mr. Davis's condition was unchanged and continued to assess him with a GAF of 50. (Tr. 975-981). His GAF was also listed as 50 on a CRG dated March 13, 2007. (Tr. 1023-1025).

In April 2007, Mr. Davis returned to Dr. Bowdoin Smith after seeing C. Todd Lewis for a period of time. Mr. Davis continued to have left knee pain and neck pain. He rated his pain a five (5) or six (6) of ten (10). He stated that his depression had been a bit worse lately but was better with the nicer weather. He stated that he had been taking Paxil for depression. Dr. Smith started him back on medications including Prednisone, Lotensin, Paxil, Flexeril, Vytorin, Vistaril (to increase duration of pain medication and help with sleep), Xanax, and Percocet. (Tr. 1068-1072). Mr. Davis continued to see Dr. Smith for monthly follow up. (Tr. 1073-1108, 1166-1197). In December 2008, Mr. Davis was treated with Xanax and Oxycodone for back pain, cervical degenerative joint disease, right hip pain, bipolar disorder and panic attack. (Tr. 1208-1225).

Mr. Davis was evaluated by Mark Loftis, M. A., S.P.E. on May 12, 2007. Mr. Loftis found Mr. Davis to endorse most symptoms of depression including crying spells, loss of interest in pleasurable activities, chronic sleep problems, loss of appetite, and occasional transient suicidal thoughts. Mr. Davis indicated that he was in his own home 90% of the time and did not venture out. Mr. Loftis opined that Mr. Davis suffered from major depressive disorder, severe without psychotic features. He did not appear to have significant limitations from a cognitive standpoint. He appeared capable of learning. He was able to understand and follow simple instructions. However, he was emotionally

9

fragile and not very resilient. It was believed that his emotional status moderately limited him in the work setting, in his ability to deal with work-related stressors, and in dealing with co-workers. Under significant stress, he could decompensate further and act out by attempting self-harm. He also alleged some medical problems that might limit him in the work setting. (Tr. 1018-1021).

On May 15, 2007, C. Warren Thompson, Ph. D. completed a Psychiatric Review Technique. He found Mr. Davis had the following restrictions: a moderate restriction of activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence and pace. (Tr. 992-1005).

Dr. Thompson also completed a mental residual functional capacity assessment on May 15, 2007. He found Mr. Davis to have the following moderate limitations: the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to work in coordination with or proximity to others without being distracted by them; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to accept instructions and respond appropriately to criticism from supervisors; and the ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. Mr. Davis was markedly limited in his ability to interact appropriately with the general public. Dr. Thompson found that he had the following functional capacity: Mr. Davis appeared able to understand and remember simple and detailed tasks; his concentration, persistence and pace were adequate for simple and detailed tasks with some difficulty at times due to anxiety working around others; he should avoid working with the general public, however, with some difficulty he should be able to interact appropriately with supervisors and co-workers over the course of a normal workweek; and he should be able to avoid workplace hazards, respond appropriately to changes in the workplace, travel to unfamiliar places and set realistic goals. (Tr. 1014-1017).

In June 2007, Mr. Davis went to Cookeville Regional Medical Center for left knee pain. He was given an ace bandage and referred to his primary care provider for an orthopedic referral. Toradol was prescribed. (Tr. 1110-1115).

He returned to Dale Hollow Mental Health Center on July 3, 2007. He was very anxious, confused and distraught. He had a bad knee injury and had just run out of his medications. He was upset because he had missed his appointment with the doctor for medical services. His Paxil was increased and his Xanax was tapered. (Tr. 1029, 1037).

On September 4, 2007, Mr. Davis started treatment at Personal Growth and Learning Center. He reported loss of self-esteem since his marriage failed and he lost his thirteen (13) year old son. The intake nurse practitioner at Personal Growth and Learning Center found Mr. Davis to have a GAF of 50. (Tr. 1122-1124). On October 17, 2007, Mr. Davis reported to counselor Robert Ridley with symptoms of depression including persistent, chronic worry, impaired concentration, and sleep disturbance. The providers at Personal Growth and Learning Center assessed Mr. Davis to have bipolar disorder with psychosis and panic disorder with agoraphobia. His GAF was assessed at 50 and he was scheduled for weekly counseling sessions. (Tr. 1043-1065).

On November 19, 2007, Mr. Davis was withdrawn and non-communicative. Mr. Ridley noted that he would continue to work to overcome social isolation. He found Mr. Davis to be profoundly depressed. (Tr. 1046). On December 3, 2007, Mr. Ridley noted that some small progress was made. (Tr. 1045). On December 14, 2007, Mr. Ridley noted progress was fair. (Tr. 1044). On February 4, 2008, Mr. Ridley noted that Mr. Davis had a flat affect and had no eye contact. (Tr. 1159).

On February 15, 2008, Dr. Daniel Donovan met with Mr. Davis for a neuropsychological evaluation at the request of Personal Growth and Learning Center. Dr. Donovan found that Mr. Davis had chronic pain issues but his consistent complaint at the time of the evaluation was major depression. He had past complaints of suicidal thoughts, poor sleep and no pleasure in life. Dr. Donovan felt that regular sessions with Robert Ridley were important to Mr. Davis's stability. Dr. Donovan opined that Mr. Davis's current level of functioning was extremely poor. (Tr. 1119-1120). On April 11, 2008, Mr. Ridley reported that Mr. Davis's mood was serious and somber. Mr. Ridley noted that Mr. Davis stated that he turns his anger inward and sometimes cuts himself during periods of intense anger. Mr. Davis's sister had come to live with him in March 2008 to prevent him from harming himself. On visits dated April 11, 2008 and June 2, 2008, Mr. Davis reported a lot of pain. (Tr. 1157).

11

On the June 2, 2008 visit, Mr. Ridley commented that Mr. Davis appeared profoundly depressed. (Tr. 1154).

On August 4, 2008, Mr. Davis went to Robert Ridley to discuss his treatment goals and a treatment contract was signed. (Tr. 1151-1153). On October 28, 2008, Mr. Davis continued to have a flat affect but he reported an improved relationship with his friend, Nancy, and a visit with his son. (Tr. 1199).

On February 27, 2009, Mr. Ridley noted that Mr. Davis's affect was euthymic and that he needed continuing care to assist him to open his world to outside help. He reported that Doxepin seemed to be helping his mood. He continued to have problems with sleep and was still living with his friend, Nancy. (Tr. 1235).

On March 4, 2009, Mr. Ridley completed a psychological assessment finding Mr. Davis had a seriously limited but not precluded ability to follow work rules, relate to co-workers, use judgment, function independently, follow simple and detailed instructions, and behave in an emotionally stable manner. He had poor to no ability to deal with the public, interact with supervisors, deal with work stresses, maintain attention and concentration, follow complex job instructions, and behave in an emotionally stable manner. []

### Hearing testimony

Mr. Davis testified that his mother drove him to the hearing. He stated that he normally has a friend or his mother drive him due to a phobia of driving caused by wrecks he was involved in. (Tr. 33, 45). He became disabled January 1, 2001 when he had a nervous breakdown. He testified that he tried to return to work until he hurt his lower back. He testified that he last worked in February 2006 and requested that his onset date be amended to February 6, 2006. (Tr. 33-34). He testified that he is unable to work due to lower back pain, neck pain, and a gunshot wound to the right hip. (Tr. 34). He testified that he takes Oxycodone 15 milligrams for pain four times daily. (Tr. 35). He described his pain as a "real sharp pain in [his] lower back." He stated that the pain was almost constant. (Tr. 39). The pain radiates to his hips and the upper part of his thighs causing occasional numbness and tingling in his feet and legs. (Tr. 39). He testified that his pain was aggravated by walking, standing on his feet too long, and sitting in one position for too long even with pain medication. His pain level increased to a six (6) or seven (7) on a ten point

scale. (Tr. 39). He averred that he can walk about 100 yards, stand fifteen minutes at a time, lift between ten (10) and fifteen (15) pounds, and sit fifteen (15) minutes at a time. (Tr. 35-36). He testified that he has problems with concentration, problems sleeping, problems getting along with others, and difficulty being in crowds. (Tr. 36). He stated that he tried to grocery shop but when there are crowds in the store, he forgets what he came for and must return the next day with a list. (Tr. 45). He testified that he takes nerve medicine, Alprazolam, to help him sleep. (Tr. 36-37). He had also been trying a new anti-depressant, Doxepin, which was supposed to help with sleep. (Tr. 37). He stated that his pain was decreased to a four (4) or five (5) on a scale of ten (10) with medication. (Tr. 37). Mr. Davis testified that he tries to use the computer and is able to use the computer for twenty (20) minutes maximum. (Tr. 38). His pain is made worse by cold weather. (Tr. 38). He stated that he is able to do some cooking and some laundry. (Tr. 38). He stated that his pain is relieved by changing positions, lying down, using a heating pad, and taking a hot shower. (Tr. 40). He also testified that he had very little feeling in his left hand. He has difficulty picking up small objects and items such as a coffee cup which are too heavy. (Tr. 40-41). He testified that he has a numb feeling in his fingertips status post carpal tunnel surgery. (Tr. 41). He stated that his left hand was injured when he tried to commit suicide by slitting his wrist twice to the bone with a razor blade. (Tr. 41). He testified that he has problems with mood swings. (Tr. 42). He stated that he gets very depressed at times and other times he cannot sleep for two to three days due to racing thoughts. He stated that he was unable to sleep every three to four days. (Tr. 43).

## III.  Conclusions of Law

### A.  Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied.  Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003).  "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th

13

Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)).  Even if the evidence could also support a different conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached.  Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999).

## B.  Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  Id. at § 423(d)(3).  In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

> 1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.
>
> 2) A claimant who does not have a severe impairment will not be found to be disabled.
>
> 3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations.  Claimants with lesser impairments proceed to step four.
>
> 4) A claimant who can perform work that he has done in the past will not be found to be disabled.
>
> 5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be

14

considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule.  See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003).  Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination.  Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990).  In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony.  See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere.  See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

C.  Plaintiff's Statement of Errors

15

Plaintiff argues that the ALJ erred in rejecting the opinions of his treating mental health care providers, in rejecting the reports of examining physicians who assessed him as having the capacity for less than medium exertional work, and in discounting the credibility of plaintiff's subjective complaints of limitation from physical pain and emotional difficulties. As explained below, the undersigned finds that the ALJ's determinations regarding the functional impact of plaintiff's mental impairments are undermined by a lack of substantial evidentiary support.

The ALJ begins his analysis of the evidence related to plaintiff's mental functioning by noting that while plaintiff's physicians prescribed him psychotropic medications for a number of years, he did not undergo any formal mental health treatment until March 2007. (Tr. 26) The ALJ proceeded to give great weight to the opinions of the nonexamining psychological consultants, Drs. Thompson and Phay, who reviewed plaintiff's file in May 2007 and September 2006, respectively. At the time of Dr. Phay's review, plaintiff's file contained no mental health treatment notes, other than records related to his treatment in the immediate aftermath of his 2001 suicide attempt. (Tr. 915) At the time of Dr. Thompson's review in May 2007, plaintiff had only recently initiated mental health treatment, with notes of such treatment in the record from two counseling sessions in March and April of 2007. (Tr. 1004) Those two treatment notes related that plaintiff was overwhelmed, reported self-harm behavior in the form of cutting himself two to four times per month, avoided crowds, had poor ability to concentrate, minimal coping skills, and isolated himself due to severe and frequent panic attacks, with diagnoses of panic disorder with agoraphobia and major depressive disorder given. Id. Dr. Thompson weighed these

16

observations against the initial report from the government's consultative examiner, dated August 8, 2006, in which Mr. Loftis diagnosed bipolar disorder and noted that plaintiff displayed some delusional thoughts and preoccupation with religious references, with reported crying spells, sleep disturbances, avoidance of social situations, and cutting himself. Id. Dr. Thompson's interpretation of this evidence led to his assessment, adopted by the ALJ, that plaintiff should avoid working with the general public, but otherwise "should be able with some difficulty to interact appropriately with supervisors and co-workers," while maintaining adequate concentration, persistence, and pace despite some difficulty at times due to anxiety from working around others. (Tr. 1016)

This assessment is in stark contrast to the remainder of the proof from examining mental health sources. As referenced in Dr. Thompson's report, plaintiff's initial psychiatric treatment with Dale Hollow Mental Health Center on March 13, 2007, showed Mr. Davis to have panic disorder with agoraphobia. Moreover, his depression was rated an eight on a ten-point scale. He noted crying spells three out of seven days. He reported anxiety and panic symptoms. He was unable to shop as a result of difficulty being around people. He reported lying down and not doing anything three (3) out of seven (7) days and self-harm behaviors including self-mutilation two to four times per month. He reported that his ex-wife was keeping his son from him and not allowing him to talk on the phone. He was assessed with a GAF of 50, indicating serious functional deficits. On April 26, 2007, Dr. Chip Fountain noted that Mr. Davis's condition was unchanged and continued to assess him with a GAF of 50. (Tr. 975-981) His GAF was also listed as 50 on March 13, 2007. (Tr. 1023-1025)

On May 12, 2007, Mr. Loftis performed his second consultative examination of plaintiff, resulting in the following diagnostic and functional assessment:

> Mr. Davis endorsed most symptoms of depression. He indicates he does have problems with crying spells. He has lost interest in pleasurable activities. His appetite has changed. He also indicates he has chronic sleep problems. He reports occasionally he has transient suicidal thoughts but denied any intent. He reports that he has cut himself in the past. He demonstrates scars on both his upper arms. He denies any hallucinations. He reports he is going to counseling on a monthly basis and also sees a psychiatrist on a monthly basis. He estimated that 90% of the time he is in his own home and he does not venture out. He alleges he is compliant with his medication. He denies any substance abuse.

> From a cognitive perspective, Mr. Davis does not appear to have significant limitations. He appears capable of learning. He can understand, and no doubt, he can probably follow simple instructions. However, emotionally, he seems somewhat fragile and not very resilient. It is believed that his emotional status moderately limits him in the work setting, in his ability to deal with work-related stressors, and in dealing with co-workers. Under significant stress, he could decompensate further and act out by attempting self-harm. ...

(Tr. 1020-21)

Licensed psychological counselor Robert M. Ridley began seeing plaintiff in September 2007 (Tr. 1051), not January 2008 as reported by the ALJ. (Tr. 26) In his initial assessment of plaintiff, Mr. Ridley diagnosed bipolar affective disorder with psychotic features and panic disorder with agoraphobia, current psychosocial stressors severe, and assigned a global assessment of functioning score indicating severe symptoms. (Tr. 1057) Mr. Ridley counseled plaintiff on at least a monthly basis until October 2008, when it was noted that he would probably need to shift to a regional provider because of changes in TennCare's coverage of mental health therapy. (Tr. 1198) Plaintiff thereafter saw Mr.

Ridley on at least one occasion, February 27, 2009.  (Tr. 1235)  Throughout this course of therapy with Mr. Ridley, plaintiff reported significant anxiety and depressive symptoms, including social isolation, persistent sadness, worry, impaired concentration, sleep disruption, and suicidal ideation without plan.  He also indicated his strong belief that suicide is not an unforgivable sin, and reported sometimes cutting himself during episodes of intense anger, or to relieve stress or emotional pain, which behavior prompted his sister to arrange for him to live with her in order to prevent self-harm.  (Tr. 1045, 1049, 1152-60)  The ALJ summarized the content of these counseling sessions without reference to these facts which Mr. Ridley deemed noteworthy, but solely by reference to the mental status exam results contained atop each treatment note, indicated by circling a preprinted description within several domains; to wit:  "Despite the claimant's mood being depressed, the claimant was generally noted to have normal thought, intact judgment, intact memory, and normal concentration during office visits through October 2008."  (Tr. 26)  Plainly, this is not a fair characterization of the content of Mr. Ridley's treatment notes.

Dr. Daniel H. Donovan, M.D., Ph.D., a neuropsychiatrist, offered the following assessment after examining plaintiff in February 2008:  "At this point in time, I find him to have a major depression of a chronic nature.  I believe there are unspecified personality features that are contributing to his ongoing depression.  I suspect there are significant feelings of inadequacy.  Neurological problems are also indicated and his current level of functioning appears extremely poor."  (Tr. 1118)

On March 4, 2009, Mr. Ridley completed an assessment of plaintiff's mental ability to perform work-related activities (Tr. 1232-34), in which he opined that plaintiff's

19

emotional impairments left him with poor or no ability to deal with the public; interact with supervisors; deal with work stresses; maintain attention and concentration; understand, remember, and carry out complex job instructions; relate predictably in social situations; and demonstrate reliability.  As grounds for his assessment, Mr. Ridley referenced a clinical record of plaintiff's continued social isolation, severe anxiety, panic symptoms which interfere with concentration, task performance and pace, withdrawal, and inability to cope with workplace demands.  (Tr. 1232)  While Mr. Ridley is not an "acceptable medical source" to whom the lofty "treating source" status can attach under the regulations, 20 C.F.R. §§ 404.1502, 1513(a), he is an "other source" entitled to consideration in the ALJ's decision due to his expertise and long-term relationship with plaintiff.  Cole v. Astrue, --- F.3d ---- , No. 09-4309, slip op. at 10 & n.4 (6th Cir. Sept. 22, 2011) (citing 20 C.F.R. § 404.1513(d)(1)), amending Cole v. Astrue, 652 F.3d 653 (6th Cir. 2011).  The Sixth Circuit in Cole amended its prior opinion in order to clarify that the opinions of the treating counselor in that case, while not on the same footing as those of the treating psychiatrist, must nonetheless be given due consideration as opinions from the claimant's front-line mental health treatment provider; the court further noted that

> Mr. Cole's situation is not unique; many unemployed disability applicants receive treatment at clinics that render care to low income patients by providing mental health treatment through such counselors.  The practical realities of treatment for those seeking disability benefits underscores the importance of addressing the opinion of a mental health counselor as a valid "other source" providing ongoing care.

Id.

     In the case at bar, the ALJ gave "little weight" to Mr. Ridley's opinions, for the

following reasons: "[I]t is inconsistent with the overall evidence of record, including with the records from the claimant's medical treatment providers, which indicate that the claimant's mental functioning was much better than that indicated by Mr. Ridley. Significantly, Mr. Ridley indicated that the claimant's social functioning had improved, as he was spending more time with 'carefully selected friends' as well as when he was spending considerable time with a female friend." (Tr. 27) However, it appears that among examining sources, the records of plaintiff's physicians are at odds with all psychological examiners when it comes to plaintiff's mental impairments -- this phenomenon is not uncommon; what is uncommon is the ALJ's decision to resolve the inconsistency pertaining to plaintiff's mental impairments against the mental health care providers, and in favor of the physical health care providers. Specifically, during the time when plaintiff was seeking mental health care from Mr. Ridley, whose records reveal significant signs and symptoms of depression and anxiety, plaintiff was also being regularly examined by Dr. Bowdoin G. Smith, whose impressions of plaintiff's mental symptomatology were largely limited to noting that his depression and anxiety might fluctuate, but were generally controlled with prescribed medications. The ALJ particularly relied upon the benign results of Dr. Smith's mental status examinations, noting that "between July 2006 and January 2009, Dr. Smith consistently observed during regular monthly office visits that the claimant did not exhibit any depression, anxiety or agitation on mental status exams, and noted on numerous occasions that the claimant's memory was intact for recent and remote events." (Tr. 26)

However, a review of Dr. Smith's records reveals that the results of his mental status exams *never* changed, no matter what was reported in the narrative history of

plaintiff's illness. Plaintiff was always noted to have intact judgment and insight; to be oriented to time, place, and person; to have intact memory for recent and remote events; and to display no depression, anxiety, or agitation -- even when, for instance, plaintiff reported continuing symptoms of depression and anxiety (Tr. 946, 948), or when a new anti-depressant medication was prescribed in response to the following presentation:

> Patient last seen here in 2003. He has a long history of bipolar disorder, severe depression, social anxiety and back pain. He has attempted suicide in 2001 by slashing his wrists. He also shot himself accidentally 2 months ago while looking at a gun that he assumed was not loaded. Airflight took him to Vandy. The bullet is still lodged in the right femur. Been out of meds for a week or so and is not doing well at all.

(Tr. 936, 938) Whether Dr. Smith in fact conducted a mental status examination of plaintiff at each office visit with unwaveringly normal results, or the reports of such examination were merely default entries on the physician's office visit form,[2] the ALJ was not justified in relying on these entries to discredit the opinions of Mr. Ridley. Moreover, the significance the ALJ attributed to Mr. Ridley's "indication that the claimant's social functioning had improved" from a marked level of impairment appears to be overstated, inasmuch as Mr. Ridley clearly opined that plaintiff had poor or no ability to relate predictably in social situations or to demonstrate reliability, and "has not overcome [his marked limitation in this area], although he now spends more time with carefully selected friends." (Tr. 27, 1233) In short, the ALJ's rejection of Mr. Ridley's assessment is not supported by substantial evidence.

---

[2]Compare the notes of plaintiff's treatment at the Smith County Medical Group Clinic from 2003-2005 (Tr. 214-86), which utilized the same form but consistently noted plaintiff to have a "labile mood and depressed affect."

22

Finally, it bears noting that a goodly portion of the ALJ's rationale for discounting plaintiff's credibility as a witness suffers from some factual infirmity. In particular, the ALJ noted that

> [T]he claimant appears to have exaggerated some of his medical conditions at various times. He alleged at the hearing, and reported to several examining consultants that he had cut his wrist to the bone during the suicidal attempt in 2001; however, the medical records indicated that the two wrist lacerations were superficial. He also reported to Mr. Loftis that he only had partial use of his left wrist due to the self-inflicted injury; however, when he was consultatively examined by Dr. Johnson in July 2006, his grip strength was the same with each of his hands, and was not significantly diminished in the left wrist. The claimant alleged at the hearing that when he had sustained a gunshot wound in April 2006, his finger bone had been shattered by the bullet; however, there is no mention of any finger injury in the medical records relating to this incident....

(Tr. 28) First, with respect to plaintiff's suicide attempt, the emergency department records do not appear to describe plaintiff's two wrist lacerations as superficial; rather, in the field denoted "Emergency Department Course," the physician's assistant appears to describe the care provided in terms of wound cleaning, closure and perhaps dressing, as follows:

> [Left] wrist cleaned [with] betadine, local 1% 5cc xylocaine. 10 sutures & 1 staple to top laceration 8 cm[;] 2nd cut 8 sutures & 1 staple 6 cm[;] superficial

(Tr. 880) Given the location of this description within the emergency department form as well as its content, it does not appear likely that the term "superficial" was meant to describe plaintiff's wounds. More likely, the term describes the nature of the sutures (versus "deep" or subcutaneous sutures[3]) or the nature of the dressing applied after closure of the wounds,

---

[3] See http://emedicine.medscape.com/article/1824895-overview.

23

but it clearly cannot be viewed as necessarily describing the injury, so as to support the determination that plaintiff exaggerates the significance of his medical problems. (In any event, it would not appear to take a very deep laceration to expose one of the bones of the wrist.)

Furthermore, Dr. Donovan subsequently described plaintiff's left wrist laceration as "severe[] ... with chronic median nerve damage." (Tr. 1118-19) Mr. Loftis made note of plaintiff's report of "partial use of left hand due to self-inflicted wound," without specifying the nature of the functional loss. (Tr. 887) However, in his hearing testimony, plaintiff described the partial loss of left hand function as involving a loss of feeling in his fingers, affecting his fine motor functioning in that hand. (Tr. 40-41) It does not appear that this report of symptoms is necessarily inconsistent with the consultative examiner's finding of only mildly diminished grip strength, as found by the ALJ.

Finally, the ALJ incorrectly states that plaintiff alleged at his hearing that, when he suffered his accidental gunshot injury, the bullet shattered his "finger bone." In fact, plaintiff testified that the bullet "buried into the top of my femur bone and shattered a little bit of it." (Tr. 34, emphasis supplied) This testimony is supported by the medical proof that "the bullet was lodged into the femoral neck." (Tr. 863)

In sum, the decision of the SSA is not supported by substantial evidence and should therefore be reversed, with remand of the matter to the agency for further development and a new decision.

24

## IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be GRANTED, and that the decision of the SSA be REVERSED and the cause REMANDED for further administrative proceedings consistent with this report.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 24th day of October, 2011.

 s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE

25

26